IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MAJOR JAMIE, | ) | Case No. 1:16 CV 2712 |
| | ) | |
| Petitioner, | ) | |
| | ) | JUDGE BENITA Y. PEARSON |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| CHARMAINE BRACY, WARDEN, | ) | THOMAS M. PARKER |
| | ) | |
| Respondent. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |

## I.    Introduction

Petitioner Major Jamie[1] filed a *pro se* petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging the constitutionality of his convictions and sentences in *State v. Jamie,* Case No. CR-14-581872-A. ECF Doc. 1. Respondent Warden, Charmaine Bracy,[2] filed a return of writ. ECF Doc. 9. And Jamie has filed a traverse. ECF Doc. 13.

The matter is before the undersigned by an automatic order of reference under Local Rule 72.2 for preparation of a report and recommendation on Jamie's petition or other case-dispositive motions. Because Jamie has presented only non-cognizable and meritless claims, I recommend that the Court dismiss Jamie's petition.

---

[1] Consistent with the Ohio Court of Appeals and the Ohio Department of Rehabilitation and Correction (and petitioner's own filings), the court will refer to petitioner as Major "Jamie," even though there is reason to believe his last name is actually spelled "Jaime." *See* ECF Doc. 9, Page ID# 31, f.n. 1.

[2] Charmaine Bracy is Warden of the Trumbull Correctional Institution ("TCI"). Jamie was transferred from TCI to Lake Erie Correctional Institution ("LECI") on February 1, 2017. Respondent asserts that Brigham Sloan is the Warden of LECI and is the proper party respondent pursuant to Rule 2(b) of the Rules Governing Section 2254 cases. ECF Doc. 9, Page ID# 31, fn. 2. Nonetheless, respondent files a return of writ, fully responds to Jamie's Grounds, and seeks dismissal of this action. ECF Doc. 9.

## II.    Factual Background

The Ohio Court of Appeals set forth the following facts underlying Jamie's convictions:

{¶ 3}  The evidence at trial demonstrated that on September 15, 2012, a maintenance worker at the Boulevard Terrace Apartments located near Madison Avenue and West Boulevard in Cleveland, Ohio, discovered the lifeless body of Robert Cherry slumped in the front seat of his car in the apartment complex parking lot.  Cleveland police officers responded to the scene.  One of the officers noticed that the body had small nick marks on the neck, although the body did not show other outward signs of violence.  Personnel from the coroner's office removed the body and conducted an autopsy.

{¶ 4}  Dr. Krista Timm, forensic pathologist for the Cuyahoga County medical examiner's office, performed the autopsy.  She testified that she noted abrasions on Cherry's neck and small hemorrhages in the soft tissue around the eyes caused by compression of blood vessels in the neck.  Dr. Timm reported that her internal examination of the body revealed injuries to the neck, including fractures of the hyoid bone and hemorrhages around the fractures.  She opined that the cause of death was homicide, and the manner was asphyxia by cervical compression.  Dr. Timm testified that Cherry's injuries could have been due to strangulation by hand; she testified further that Cherry could have caused the nicks to his neck as he was trying to defend himself.

{¶ 5}  Kenneth Bradford testified that he and Cherry had been romantically involved in the late 1980s, but remained best friends after their romantic relationship ended.  Bradford testified that at the time of his death, Cherry's "main boyfriend" was Jamie, although he was also dating Donald "Tank" Simon, and a man named Heidi.  Bradford said that Cherry had told him that Simon was upset because Cherry was ending their relationship to be with Jamie.  Bradford said that Cherry was in love with Jamie and initially excited when Jamie returned to Cleveland in August 2012, but their relationship quickly became "rocky" because Jamie also had a girlfriend.

{¶ 6}  Jamie and his girlfriend, Lisha Robinson, lived on West 99th Street in Cleveland, only a few blocks away from Cherry's apartment.  Bradford testified that Cherry told him that he planned to tell Robinson about his relationship with Jamie.  Robinson testified that she knew nothing about Cherry when she lived with Jamie, and only learned of his sexual preference in June 2014, when she watched "The First 48," a television program about the police investigation of Cherry's murder.

{¶ 7}  On the evening of September 14, 2012, Bradford, his friend Ulysses Tyler, and Cherry went to the home of Gloria and Jeffrey Monday to socialize and drink.

2

According to Gloria, Cherry spoke with Jamie by telephone once during the evening.  Bradford said that he, Tyler, and Cherry left the gathering at approximately 12:30 to 1:00 a.m. on September 15, 2012.  Bradford testified that Cherry had told him several times that he was going to meet Jamie later to celebrate his birthday.

{¶ 8}  Cleveland police detective Raymond Diaz testified that he began investigating the murder on September 17, 2012.  Upon searching Cherry's apartment, the police found a letter from Jamie dated August 8, 2011, signed "your man and husband, Major Jaime," and a handwritten note containing the name and telephone number of Jamie's parole officer on the night stand in the bedroom.  The police also found a calendar hanging on the bedroom wall that contained handwritten entries for August 25, 2012 through August 31, 2012, and September 1, 2012 through September 4, 2012.  Jamie was shown the calendar when he was interrogated and identified the calendar and the writing on it as Cherry's.  The entries on the calendar detail Cherry's feelings about the days in question and show that his relationship with Jamie deteriorated quickly after August 25, 2012.  The last entry, dated September 4, 2012, states that Cherry called the police about Jamie to report "what he's doing and what he did in jail and where he's living lot's of drugs."

{¶ 9}  Diaz testified that after interviewing Bradford, the police began investigating Jamie.  Tom Ciula, the forensic video and audio specialist for the Cleveland police department, obtained surveillance videos from 11:45 p.m., September 14, 2012, to 4:00 p.m., September 15, 2012, from six locations near the Boulevard Terrace Apartments, including the CVS store on the east corner across the street from Cherry's apartment, a pawn shop on the southeast corner, and Cleveland Fire Station No. 23, located at 9826 Madison Avenue in Cleveland.  Ciula put the videos from the various locations together to create a timeline of events from 12:13 a.m. to 1:38 a.m.

{¶ 10}  The video showed that at approximately 12:14 a.m., a vehicle similar to Cherry's turned from Madison Avenue into the driveway of the Boulevard Terrace Apartments.  About four minutes later, the same vehicle came back out of the driveway and turned eastbound on Madison Avenue.  At approximately 12:29 a.m., the same vehicle turned south onto West 99th Street.  Six minutes later, the same vehicle came up West 100th Street, turned westbound onto Madison Avenue and then turned into the apartment complex driveway and went behind the apartment building.  At 1:08 a.m., a male walked from the apartment complex parking lot across West Boulevard, and then headed east on Madison Avenue. The male subsequently crossed to the south side of Madison Avenue, walked through a park located at the end of West 99th Street, and then walked up West 99th Street.

{¶ 11}  Diaz testified that he believed the car in the video sequence was Cherry's because the driver in the video was wearing a white hat, which the police later

3

found in his car.  Diaz also testified that upon his review of the video, he saw one person in the car when it initially headed east on Madison Avenue toward West 99th Street, but two people in the car when it returned to the apartment complex. Jamie's girlfriend Lisha Robinson testified that the quickest way to her house from Madison Avenue was to cut through the park at the end of the street, and acknowledged that the figure in the video was walking in the direction of her house.  She also testified that the figure in the video had dreadlocks, and that Jamie had dreadlocks at the time of the murder.  Diaz testified that when the police interviewed Jamie on September 20, 2012, they observed scratch marks on his right hand and left wrist.

{¶ 12}  Diaz testified that Cherry's cell phone records indicated that all outgoing activity from Cherry's phone stopped on September 15, 2012, at 12:43 a.m.  The text messages also demonstrated that Cherry and Jamie's relationship quickly deteriorated after Jamie returned to Cleveland.  For example, on August 29, 2012, Cherry texted Jamie, "Same old shit Major.  U played wit my feelings again and used me for ur come up.  Its cool. See u in a minute wit all ur shit.  I want my keys and phone. Be wit her."  When Jamie responded that he would be home soon, Cherry texted, "No, I mean wat I said dude.  U still da asshole from before. I don't want to argue or fight.  Just do u leave me alone.  I want my shit.  Nothing else.  Please."  On August 31, 2012, Cherry texted Jamie that "U lie about everything.  U see how u do me.  After three years why do I have to be dogged by u for people who was not there for u.  I am not doing good man."  Jamie responded, "U trippin about nothing.  I will be home!"  Within five minutes, Cherry texted Jamie, "No, I am not tripping.  U will see tonight how I can trip u when u get here.  I will call da police.  I ask u not to fuck wit me, didn't I."  The following day, September 1, 2012, Jamie texted Cherry that he would see him when he got off work.  Cherry responded, "I am prepared to die this morning on everything I love.  U coming out or I am coming in.  I am telling it all in front of them all."  The texts reflect that on September 2, 2012, Cherry put Jamie's belongings on Jamie's girlfriend's porch and then told him, "U have wat u want. Be happy.  Give my keys and phone.  If no phone goes off at 3 today.  I talked to police already.  Told them all.  U are not suppose to be here.  No way."  When Jamie responded, "Whatever! Kick Rocks Hoe!", Cherry texted him, "Da police told me to call ur PO and tell him what I told them cause I am afraid for my life. They will pick you up now.  Whos da hoe."  Diaz pointed out in his testimony that this text corresponded with Cherry's September 2, 2012 notation on his calendar of "Night. Called me. Told me to kick rocks. Why. My turn. Police."

{¶ 13}  Tony Luketic, Jamie's parole officer, testified that he began supervising Jamie in August 2012 when he returned to Cleveland.  He said that on September 6 or 7, 2012, he received a voicemail from Cherry in which Cherry advised him of something that would have been a violation of Jamie's parole.  Luketic returned Cherry's call but was unable to reach him.  Luketic said that he recognized the voice as Cherry's because he had spoken with Cherry in mid-August 2012 to advise him why Jamie's placement with Cherry had been denied.

{¶ 14}  Carey Baucher, a DNA analyst in the Cuyahoga County's medical examiner's office, testified regarding various DNA samples obtained from Cherry's car.  The DNA swab from under the fingernails of Cherry's left hand was a mixture of Cherry and Jamie's DNA.  Jamie's DNA was also found in a swab from the rear of the driver's seat headrest.  Baucher also identified a DNA sample retrieved from the right rear door interior handle as belonging to Simon. She testified that during her investigation in 2013, she had submitted the sample to the Ohio DNA database (CODIS) and received a match to Simon.  She emailed the Cleveland police department several times in May and June 2013 requesting either a DNA standard from Simon or an acknowledgment that he was not a suspect, but received no response to her request.

{¶ 15}  Simon testified that he met Cherry in 2011 and was not surprised that his DNA was found in Cherry's car because he had been in the car "a lot."  He said that he and Cherry were not in love with each other, although they would sometimes drink too much and then sleep together.  At the time of the murder, he lived with his girlfriend, who knew nothing about Cherry.  He denied killing Cherry and testified that he last saw him two weeks before he was murdered.

{¶ 16}  On cross-examination, Simon admitted that he was never interviewed in 2012 about Cherry's murder.  He also admitted that on September 8, 2012, about a week before his death, Cherry called him 38 times from 9:41 p.m. Friday evening to 5:00 a.m. Saturday morning.  Simon testified that most of these calls were probably voicemails, however, and that he only called Cherry back twice during that period.  Simon testified further that he knew Cherry was in love with Jamie and insisted he was not upset when he learned that Jamie was returning to Cleveland in August 2012.  He denied that Cherry ever threatened to divulge their sexual relationship to his girlfriend or to his mother, Gloria Monday, or stepfather, Jeffrey Monday.

{¶ 17}  The defense rested without presenting any witnesses.  After the trial court granted Jamie's Crim.R. 29 motion in part and dismissed Count 2 (aggravated murder), the jury found him not guilty of aggravated murder (Count 1) but guilty of kidnapping, murder, and felonious assault (Counts 3, 4, and 5).  The trial court sentenced him to 15 years to life in prison, and this appeal followed.

*State v. Jamie*, 8th Dist. Cuyahoga No. 102103, 2015-Ohio-3853, ¶¶ 3-17.  These facts "shall be

presumed to be correct," unless Jamie rebuts them by clear and convincing evidence.  28 U.S.C.

§ 2254(e)(1); *Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998).

### III.    Relevant State Procedural History

### A.    Trial Court

On January 27, 2014, a Cuyahoga County grand jury indicted Jamie on five counts: aggravated murder, in violation of Ohio Rev. Code § 2903.01(A) (Count One); aggravated murder, in violation of  Ohio Rev. Code § 2903.01(B) (Count Two); kidnapping, in violation of Ohio Rev. Code § 2905.01(A)(3) with a repeat violent offender specification, under § 2941.149(A) (Count Three); murder, in violation of § 2903.02(B)(Count Four); and felonious assault, in violation of Ohio Rev. Code § 2903.11(A)(1) with a repeat violent offender specification under § 2941.149(A) (Count Five).  ECF Doc. 9-1 at Page ID# 70-72.  Jamie pleaded not guilty to all charges.  ECF Doc. 9-1 at Page ID# 73.

The trial court appointed lead and co-counsel to represent Jamie.  ECF Doc. 9-1 at Page ID# 74.  On May 8, 2014, the state filed a Notice of Intent to Use Evidence pursuant to Ohio R. Evid. 404(B), setting forth law and argument supporting the admission of other acts evidence. ECF Doc. 9-1 at Page ID# 103.

The jury trial began on September 11, 2014.  At the close of the state's case, Jamie moved for Rule 29 acquittal.  The court granted the motion on Count Two and denied the motion on the remaining counts.  ECF Doc. 9-1 at Page ID#110.  The defense presented no evidence. ECF Doc. 9-1 at Page ID# 111.  At the close of the case, the trial court denied Jamie's renewed motion for acquittal on the remaining counts.  Id.

The jury began deliberating on September 22, 2014.  Id.  On September 24, 2014, the jury returned guilty verdicts on the kidnapping charge in Count Three, the murder charge in Count Four, and the felonious assault charge in Count Five.  The jury returned a "not guilty" verdict on aggravated murder charged in Count One.  ECF Doc. 9-1 at Page ID# 112.  Jamie

filed a *pro se* motion for a new trial on October 2, 2014.  ECF Doc. 9-1 at Ex. 14, Page ID# 113.

He withdrew this motion before sentencing on October 8, 2014.  ECF Doc. 9-1 at Ex. 15, Page

ID# 118.  The state elected to merge Counts 3 (kidnapping) and Count 5 (felonious assault) with

the sentence for Count 4 (murder).  On October 8, 2014, the court sentenced Jamie to 15 years to

life in prison.  ECF Doc. 9-1 at Ex. 16, Page ID# 119.

     **B.**     **Direct Appeal**

     On October 23, 2014, Jamie, through new counsel, filed a notice of appeal in the Ohio

Court of Appeals.  ECF Doc. 9-1 at Ex. 46, Page ID# 121.  His appellate brief assigned six

errors:

1.  THE DEFENDANT WAS DENIED DUE PROCESS OF LAW AND A FAIR TRIAL IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS WHEN THE STATE WITHHELD EVIDENCE FAVORABLE TO THE DEFENSE.

2.  CONDUCT OF THE STATE AND COURT BELOW INDUCED INEFFECTIVE ASSISTANCE OF COUNSEL AND THEREBY DEPRIVED THE APPELLANT OF HIS RIGHTS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS.

3.  THE APPELLANT WAS DENIED DUE PROCESS OF LAW AND A FAIR TRIAL AS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION DUE TO ADMISSION OF DAMAGING 'OTHER ACTS' EVIDENCE.

4.  THE VERDICT BELOW FINDING THE APPELLANT GUILTY OF MURDER WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

5.  THE ADMITTEDLY NEGLIGENT INVESTIGATION BY THE CLEVELAND POLICE DEPARTMENT IN THIS CASE COMPROMISED THE ENTIRE PROSECUTION AND DEPRIVED THE APPELLANT OF DUE PROCESS AND EQUAL PROTECTION OF LAW.

6.      THE APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF
COUNSEL DUE TO THE FAILURE OF COUNSEL TO REQUEST A
MISTRIAL DUE TO THE STATE'S *BRADY* VIOLATION.

ECF Doc. 9-1 at Ex. 18, Page ID# 126.  On September 3, 2015, the Ohio Court of Appeals

affirmed the judgment of the trial court.  ECF Doc. 9-1 at Ex. 20, Page ID# 176-198, *Jamie*,

2015-Ohio-3853.

Jamie, acting *pro se*, filed a timely notice of appeal to the Ohio Supreme Court.  ECF

Doc. 9-1 at Ex. 22, Page ID# 202.  His memorandum in support of jurisdiction asserted six

propositions of law:

1.      Was appellant denied due process of law and a fair trial in violation of the
Fifth and Fourteenth Amendment when the State withheld evidence
favorable to the defense?

2.      Did the conduct of the State and court induce ineffective assistance of
counsel and thereby [deprive] the appellant of his rights guaranteed by the
Sixth and Fourteenth Amendments?

3.      Was appellate denied due process of law and a fair trial as guaranteed by
the Sixth and Fourteenth Amendments due to the admission of damaging
"other acts" evidence?

4.      Was the appellant's conviction against the manifest weight of the
evidence?

5.      Did the admittedly negligent investigation by the Cleveland Police
Department in this case compromise the entire prosecution and deprive the
appellant of due process and equal protection of the law?

6.      Was appellant denied effective assistance of counsel due to failure of
counsel to request a mistrial due to the State's *Brady* violation?

ECF Doc. 9-1 at Ex. 22, Page ID# 203 (capitalization altered).  The court declined to accept

jurisdiction of the appeal on December 30, 2015.  ECF Doc. 9-1 at Ex. 23, Page ID# 244.

### C.    Post-Conviction Petitions to Vacate and Set Aside Sentence

Earlier, on April 23, 2015, Jamie filed a *pro se* petition to vacate or set aside judgment or sentence pursuant to R.C. § 2953.21.  ECF Doc. 9-1 at Ex. 24, Page ID# 245.  Jamie's petition raised one claim for relief:

> 1.    Where petitioner's trial counsel's performance fell below an objective standard of reasonableness which prejudiced petitioner from receiving a fair trial, petitioner was deprived of his constitutional right to effective assistance as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.

ECF Doc. 9-1 at Ex. 24, Page ID# 250 (capitalization and punctuation altered).  On February 22, 2016, the court granted summary judgment for the state and dismissed the petition.  ECF Doc. 9-1 at Ex. 27, Page ID# 285.  Jamie did not appeal the court's decision.

## IV.    Federal Habeas Corpus Petition

Jamie's *pro se* petition for writ of habeas corpus, ECF Doc. 1, asserts six grounds for relief:

> 1.    Petitioner was denied due process under the Fifth and Fourteenth Amendments when the State withheld evidence favorable to the defense.
>
> <u>Supporting Facts</u>:  The State withheld DNA evidence from the defense.  The evidence was not presented to the defense and the court until after the trial had begun.  The defense was prejudiced as there was no time to develop a defense based on the evidence.  The evidence was exculpatory and critical to the defense and innocence of the petitioner.
>
> 2.    The conduct of the State and the court below induced ineffective assistance of counsel and thereby deprived the petitioner of his rights guaranteed by the Sixth and Fourteenth Amendments.
>
> <u>Supporting Facts</u>:  The State withheld DNA evidence from the defense.  The evidence was not presented to the defense and the court until after the trial had begun.  The defense was prejudiced as there was no time to develop a defense based on the evidence.  The evidence was exculpatory and critical to the defense and innocence of the petitioner.  Defense counsel was prevented from the review of the evidence by the State's interference, denying him the ability to effectively provide assistance to petitioner.

9

3. The petitioner was denied due process of law and a fair trial as guaranteed by the Sixth and Fourteenth Amendments to the U.S. Constitution due to admission of damaging "other acts" evidence.

   Supporting Facts:  Over defense counsel's objections, the trial court allowed petitioner's parole officer to testify regarding petitioner's prior convictions to his prejudice.  This improperly introduced "other acts" evidence to the jury. In overruling the objection, the trial court stated that he would try to correct the prejudice to petitioner by providing the jury with a limiting instruction, which the court failed to do.

4. The admittedly negligent investigation by the Cleveland Police Department in this case compromised the entire prosecution and deprived the petitioner of his due process and equal protection of law.

   Supporting Facts: The Cleveland Police Department admitted to performing a negligent and defective investigation, one that the detective "was not proud of."  The investigating officer stated that he should have done many things differently during the investigation.  The investigation was filmed by a reality T.V. show, "The First 48," and was then aired nationally almost six months prior to petitioner's trial.  The show featured petitioner's interrogation where he mentioned several other possible suspects who could have committed the crime.  The State then had these potential perpetrators testify as witnesses after they had viewed petitioner's interrogation.  This tainted the investigation with regard to alternate theories and perpetrators for the crime.  Other suspects' DNA was found at the scene of the crime that were ignored by the police investigation.

5. Petitioner was denied the effective assistance of counsel due to the failure of counsel to request a mistrial based on the state's discovery violation, or to have presented the client with the option of requesting a mistrial.

   Supporting Facts: Petitioner was rendered ineffective assistance of counsel due to the State's improper mid-trial disclosure of discovery.  Counsel did not consult with petitioner before refusing the trial court's offer of a mistrial, even when counsel knew that he had no time to investigate and prepare cogent argument or a defense based on the recently disclosed evidence.

6. Petitioner puts forth a claim of actual innocence based on evidence that was not presented to the jury, but should have been.  The failure to present the evidence to the jury deprived petitioner of a fair trial and resulted in his wrongful conviction.

   Supporting Facts:  Petitioner was deprived of a fair trial and wrongfully convicted when timeline evidence confirming alibi was not presented to the

> jury showing that Petitioner could not possibly have been involved with the
> murder of the victim in this case.  Additional evidence of the source of
> petitioner's marks on his hands shows that he did not receive the marks from
> any altercation.

ECF Doc. 1 at Page ID# 4-10.  Warden Bracy filed a return of writ on March 8, 2017.  ECF Doc.

9.  On May 10, 2017, Jamie filed a traverse.  ECF Doc. 13.

## V.    Standards of Review

### A.    AEDPA Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs Jamie's

petition for writ of habeas corpus.  *Lindh v. Murphy*, 521 U.S. 320, 336 (1997); *Murphy v. Ohio*,

551 F.3d 485, 493 (6th Cir. 2009).  AEDPA, which amended 28 U.S.C. § 2254, was enacted "to

reduce delays in the execution of state and federal criminal sentences, particularly in capital

cases, and 'to further the principles of comity, finality, and federalism.'"  *Woodford v. Garceau*,

538 U.S. 202, 206 (2003) (quoting *(Michael) Williams v. Taylor*, 529 U.S. 420, 436 (2000)).

The Act "recognizes a foundational principle of our federal system:  State courts are adequate

forums for the vindication of federal rights."  *Burt v. Titlow*, 134 S. Ct. 10, 15 (2013).  It

therefore "erects a formidable barrier to federal habeas relief for prisoners whose claims have

been adjudicated in state court."  *Id.*

One of AEDPA's most significant limitations on district courts' authority to grant writs

of habeas corpus is found in § 2254(d).  That provision forbids a federal court from granting

habeas relief with respect to a "claim that was adjudicated on the merits in State court

proceedings" unless the state-court decision either:

> (1) resulted in a  decision  that  was  contrary to,  or involved  an  unreasonable
>     application of, clearly established Federal law, as determined by the Supreme
>     Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

Habeas courts review the "last *explained* state-court judgment" on the federal claim at issue. *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991) (emphasis original). A state court has adjudicated a claim "on the merits," and AEDPA deference applies, regardless of whether the state court provided little or no reasoning at all for its decision. *Harrington v. Richter*, 562 U.S. 86, 99 (2011).

 "Clearly established Federal law" for purposes of § 2254(d)(1) "is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). It includes "only the holdings, as opposed to the dicta, of [Supreme Court] decisions." *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (internal quotation marks and citations omitted). The state-court decision need not refer to relevant Supreme Court cases or even demonstrate an awareness of them; it is sufficient that the result and reasoning are consistent with Supreme Court precedent. *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam). And a state court does not act contrary to clearly established law when the precedent of the Supreme Court is ambiguous or nonexistent. *See, e.g., Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) (per curiam).

A state-court decision is contrary to "clearly established Federal law" under § 2254(d)(1) only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). And "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

A state-court decision is an "unreasonable determination of the facts" under § 2254(d)(2) only if the court made a "clear factual error."  *Wiggins v. Smith*, 539 U.S. 510, 528-29 (2003). The petitioner bears the burden of rebutting the state court's factual findings "by clear and convincing evidence."  *Burt*, 134 S. Ct. at 15; *see also Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011).  This requirement mirrors the "presumption of correctness" AEDPA affords state-court factual determinations, which only can be overcome by clear and convincing evidence.  28 U.S.C.  § 2254(e)(1).  The Supreme Court has cautioned, "'a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'"  *Burt*, 134 S. Ct. at 15 (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)).

Indeed, the Supreme Court repeatedly has emphasized that § 2254(d), as amended by AEDPA, is an intentionally demanding standard, affording great deference to state-court adjudications of federal claims.  The Court has admonished that a reviewing court may not "treat[] the reasonableness question as a test of its confidence in the result it would reach under *de novo* review," and that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable."  *Harrington*, 562 U.S. at 102; *see also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold.").  Rather, § 2254(d) "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems" and does not function as a "substitute for ordinary error correction through appeal."  *Harrington*, 562 U.S. at 102-03 (internal quotation marks omitted).  Thus, a petitioner "must show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in

existing law beyond any possibility for fairminded disagreement."  *Id*. at 103.  This is a very high

standard, which the Court readily acknowledges:  "If this standard is difficult to meet, that is

because it is meant to be."  *Id*. at 102.

> **B.**     **Cognizable Federal Claim**

A petition for a writ of habeas corpus filed by a petitioner imprisoned under the judgment

of a state court is governed by 28 U.S.C. § 2254(a), which permits the state prisoner to challenge

his custody "only on the ground that he is in custody in violation of the Constitution or laws or

treaties of the United States."  *Id.*  To say that a petitioner's claim is not cognizable on habeas

review is another way of saying that his claim "presents no federal issue at all."  *Bates v.*

*McCaughtry,* 934 F.2d 99, 101 (7th Cir. 1991).

Federal habeas corpus relief "does not lie for errors of state law."  *Lewis v. Jeffers*, 497

U.S. 764, 780 (1990), and the federal court is bound by the state court's interpretations of state

law.  *See e.g. Wainwright v. Goode,* 464 U.S. 78, 84 (1983).  A federal habeas court does not

function as an additional state appellate court reviewing state courts' decisions on state law or

procedure.  *Allen v. Morris,* 845 F.2d 610, 614 (6th Cir. 1988) (citing *Oviedo v. Jago,* 809 F.2d

326, 328 (6th Cir. 1987).  "[F]ederal courts must defer to a state court's interpretation of its own

rules of evidence and procedure" in considering a habeas petition.  *Allen,* 845 F.2d at 614,

quoting *Machin v. Wainwright,* 758 F.2d 1431, 1433 (11th Cir. 1985).

## VI.     **Analysis**

> **A.**     **Ground One**

In Ground One, Jamie asserts that the state denied his due process rights under the Fifth

and Fourteenth Amendments when it withheld evidence favorable to his defense.  During trial,

the prosecutor told the court and defendant that he had just learned that a DNA sample found in

the backseat of the victim Robert Cherry's car belonged to Donald "Tank" Simon, one of Cherry's boyfriends.  Jamie contends that he was prejudiced by the state's delay in providing this information.

To establish a violation of the Due Process Clause under *Brady v. Maryland,* 373 U.S. 83 (1963), Jamie must show that: (1)  the prosecution suppressed evidence; (2)  the evidence was favorable to the accused; and (3)  the suppressed evidence was material to guilt or punishment, "irrespective of the good faith or bad faith of the prosecution."  *Moore v. Illinois,* 408 U.S. 786, 794-795 (1972).  The issue of materiality for *Brady* purposes pertains only to the question of a defendant's guilt or innocence, not to the issue of a defendant's ability or inability to prepare for trial.  *United States v. Phillip,* 948 F.2d 241, 249 (6th Cir. 1991) citing *United States v. Agurs*, 427 U.S. 97, 112 n. 20, 49 L. Ed. 2d 342, 96 S. Ct. 2392 (1976); *see also United States v. Presser*, 844 F.2d 1275, 1282 (6th Cir. 1988).  Evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Pennsylvania v. Ritchie*, 480 U.S. 39, 57, 94 L. Ed. 2d 40, 107 S. Ct. 989 (1987); *see also Presser*, 844 F.2d at 1282.  A reasonable probability is one "sufficient to undermine confidence in the outcome."  *Ritchie*, 480 U.S. at 57.  Certainly, information withheld by the prosecution is not material unless the information consists of, or would lead directly to, evidence admissible at trial for either substantive or impeachment purposes.  *See, e.g., United States v. Kennedy,* 890 F.2d 1056, 1059-60 (9th Cir. 1989), cert. denied, 494 U.S. 1008, 110 S. Ct. 1308, 108 L. Ed. 2d 484 (1990); *United States v. Ranney*, 719 F.2d 1183, 1190 (1st Cir. 1983); *United States v. Cuthbertson*, 651 F.2d 189, 195, 200 (3d Cir.), cert. denied, 454 U.S. 1056, 70 L. Ed. 2d 594, 102 S. Ct. 604 (1981).

Jamie contends that the prosecution's delay in providing Simon's DNA evidence prevented him from preparing his defense.  However, he does truly not argue that this evidence pertained to his innocence or guilt, apart from his frequent, cursory assertion that the evidence would have been "exculpatory."  *See, e.g.,* ECF Doc. 1, Page ID# 4, 5; ECF Doc. 13, Page ID# 1433.  Jamie argues that had he known of the DNA evidence putting Tank Simon in Cherry's car, he would have been able to develop a scenario in which Simon "could be the possible killer of Mr. Cherry."  ECF Doc. 13, Page ID# 1437.  He argues knowing the evidence could have caused his counsel to "look[] more deeply into the activities of Donald Simon."  *Id.* at Page ID# 1438.  It is apparent that Jamie's main argument is that he lost the opportunity to develop an alternative suspect to argue about before the jury.  He admits, "The question herein is not whether the Petitioner would have more likely than not have received a different verdict with prior knowledge of the delayed DNA evidence, but whether in its absence did receive a fair and just trial . . . ."  *Id.* at Page ID# 1439.  Unfortunately, Jamie's admission on this point is dispositive of this argument.  Contrary to his view, the question on his *Brady* claim is precisely whether the knowing the late-disclosed evidence sooner would likely have resulted in a different verdict.

Given the significance of DNA evidence, Jamie could not really fashion an argument that having the Simon DNA evidence earlier would likely have changed the outcome of the trial.  DNA evidence shows one thing: presence of a person at a place.  It does not necessarily reveal when the person was present.  Here, Simon testified (and Jamie does not dispute) that he had been in Cherry's car often.  *State v. Jamie*, 8th Dist. Cuyahoga No. 102103, 2015-Ohio-3853, ¶ 15, page 5 *supra*.  The late-disclosed DNA evidence would have shed no light on whether Simon was in Cherry's car on the night he was murdered.  More problematic for Jamie, regardless of

whether Simon's DNA was in the back of Cherry's car, the prosecution presented evidence that Jamie's DNA was both in Cherry's car and under Cherry's fingernails.  ECF Doc. 9-6 at Page ID# 1167-1168, 1186-1186.  Just as with Simon's, Jamie's car-DNA shows only that he had been in the back seat of Cherry's car at some time.  But Jamie's DNA under Cherry's fingernails is much more indicative of Jamie's presence closer to the day of the murder, given that material under fingernails tends to be washed away through normal living activities.  Thus, it is questionable whether the DNA evidence of Simon is even material *Brady* evidence because it does not relate directly to Jamie's guilt or innocence.  Jamie has not really argued, and the record does not support, the idea that the earlier disclosure of the Simon DNA evidence probably would have resulted in a different trial outcome.  The jury was aware that both Simon and Jamie were in Cherry's car, and the jury resolved the factual disputes against Jamie.

A separate issue must be considered, however.  Even though Jamie has not clearly argued that the delayed DNA evidence was impeachment evidence, this would be an alternative ground for a *Brady* violation.  Impeachment evidence, as well as exculpatory evidence, falls within the *Brady* rule.  *Bagley,* 473 U.S. at 676.  Impeachment evidence is "evidence favorable to the accused" because the jury's assessment of the reliability and truthfulness of a given witness may well be determinative of the defendant's guilt or innocence.  *Id. citing Napue v. Illinois,* 360 U.S. 264, 269 (1959).  Here, this argument also fails because the prosecution disclosed Simon's DNA evidence during trial, and Jamie's counsel had the benefit of cross-examining Simon after learning that his DNA was in the car.  Moreover, Simon did not provide incriminating evidence against Jamie that would have been called into question by the impeachment evidence.  Rather, his testimony related to whether or not he (Simon) should have been considered a suspect in

Cherry's murder investigation.  There is no reasonable probability that, had the evidence been disclosed (earlier) to the defense, the result of the proceeding would have been different.

Jamie cites two cases for the proposition that a delay in disclosing exculpatory information violates *Brady*, when it causes prejudice to the accused.  ECF Doc. 13 at Page ID# 1440.  These cases do not support his argument.  The first case, *State v. Bencs,* 28 F.3d 555, 561 (6th Cir. 1994), actually undermines Jamie's argument.  In *Bencs,* the Sixth Circuit held that the defendant had no cognizable claim of error when delayed evidence hindered defendant's trial preparation and led to less effective cross-examination of witnesses.  The court cited *Presser* as follows:

> Any prejudice the defendant may suffer as a result of disclosure of the impeachment evidence during trial can be eliminated by the trial court ordering a recess in the proceedings in order to allow the defendant time to examine the material and decide how to use it.

*Bencs,* 28 F.3d at 561, *citing Presser,* 844 F.2d at 1283-1284.  Here, the state disclosed Simon's DNA evidence during trial.  The trial judge asked Jamie's attorney, "So what's your remedy?  Do you want it excluded or a mistrial and you want to start over?"  ECF Doc. 9-5 at Page ID# 897.  Jamie's attorney said that he didn't want the evidence excluded but wanted "an awful lot of latitude with respect to questioning some of these witnesses that are still to come…"  *Id.*  And he cross-examined Donald Simon after the evidence was disclosed.  *Bencs* doesn't support Jamie's argument of prejudice due to delay in disclosure.

Jamie also cites *Murphy v. United States,* No. 2:14-CV-1706, 2016 U.S. Dist. LEXIS 62271 (S.D. Ohio May 11, 2016).  But in *Murphy,* the trial court noted that the Sixth Circuit had already rejected the defendant's argument that a delay in disclosure of evidence was a *Brady* violation.  The defendant had not explained how the evidence would have been exculpatory or why it would have changed the outcome of the trial.  *Murphy*, 2016 U.S. Dist. at *46-*48.  The

cases cited by Jamie reject similar arguments that delays in disclosure of evidence preventing full investigation by defendants amount to *Brady* violations.  *Id.*  These cases do not support Ground One of Jamie's petition.

Moreover, this court cannot grant habeas relief with respect to a "claim that was adjudicated on the merits in State court proceedings" unless the state-court decision involved an unreasonable application of federal law as determined by the Supreme Court of the United States or was based on an unreasonable determination of facts.  The Ohio Court of Appeals adjudicated this claim on the merits as follows:

A.  Due Process of Law and a Fair Trial

{¶ 18}  In the middle of trial, the prosecutor revealed to the defense that it had just learned from Baucher that a DNA sample found in the backseat of the car where Cherry was found had been identified as belonging to Simon, one of Cherry's boyfriends.  In a lengthy discussion with the court following this disclosure, the defense acknowledged that the discovery of Simon's DNA in Cherry's car bolstered its defense, but argued that the defense would have investigated Simon more fully if they had known that his DNA had been found in the car.  In response, the trial court asked defense counsel, "So what's your remedy?  Do you want it excluded or a mistrial and you want to start over?"  Counsel did not ask for a mistrial and stated that the defense did not want evidence of Simon's DNA excluded, but requested latitude in questioning witnesses about Simon.

{¶ 19}  In his first assignment of error, Jamie contends that he was denied due process of law and a fair trial because the state withheld exculpatory evidence, specifically the fact that Simon's DNA had been found in the back seat of the car.  He contends there is no question that the state withheld the evidence, and that the evidence of Simon's DNA in Cherry's car was material because it gave the defense a solid basis to argue an alternate suspect.  Accordingly, he argues that the prosecution's failure to disclose the evidence regarding Simon's DNA was a "clear violation" of *Brady v. Maryland,* 373 U.S. 83, 83 S. Ct. 1194, 10 L.Ed.2d 215 (1963).

{¶ 20}  In *Brady*, the United States Supreme Court held that the prosecution's suppression of evidence favorable to the accused upon request violates due process where the evidence is material to guilt or punishment, irrespective of the government's intentions. Id. at 87.  Subsequently, in *United States v. Agurs*, 427 U.S. 97, 103, 96 S. Ct. 2392, 49 L.Ed.2d 342 (1976), the United States Supreme

Court stated that the *Brady* rule applies only in situations involving the discovery after trial of information that was known to the prosecution but unknown to the defense.  Accordingly, the Ohio Supreme Court has found there is no *Brady* violation where the alleged exculpatory records were presented during trial.  *State v. Wickline*, 50 Ohio St.3d 114, 552 N.E.2d 913 (1990).  Because the prosecutor presented the evidence of Simon's DNA to the defense during trial, there was no *Brady* due process violation.

{¶ 21}  Moreover, we find no violation of Jamie's right to a fair trial.  Crim. R. 16 regulates discovery in criminal trials.  Under Crim. R. 16(E)(3), the trial court is vested with discretion in determining the sanction to be imposed for a party's nondisclosure of discoverable material.  Specifically, the rule provides that where it is brought to the court's attention that a party has failed to properly disclose evidence, the court may order the party to permit the discovery or inspection, grant a continuance, prohibit the party from introducing in evidence the material not disclosed, or make any other order it deems just under the circumstances.  Thus, our review is limited to whether the trial court's action in this case constituted an abuse of discretion.  *State v. Parson*, 6 Ohio St.3d 442, 445, 6 Ohio B. 485, 453 N.E.2d 689 (1983).  We find that it did not.

{¶ 22}  First, as defense counsel admitted at trial, the state's failure to disclose was not a willful violation of Crim. R. 16.  Second, other than his vague assertion that the defense would have investigated Simon more thoroughly prior to trial, Jamie has not demonstrated how knowledge that Simon's DNA was found in Cherry's car would have benefitted him in the preparation of his defense.  Notably, when the prosecutor told the defense about Simon's DNA, counsel did not request a continuance for further investigation.  Third, Jamie has failed to demonstrate that he was prejudiced by the state's failure to disclose that Simon's DNA was found in Cherry's car.  In fact, it is apparent the defense was well aware of Simon prior to trial.  He was listed on the state's witness list, and his telephone number appeared on the phone records that were provided to defense counsel prior to trial and used by defense counsel to extensively cross-examine witnesses, including questioning Simon about Cherry's 38 calls to him.  Jamie's defense from the outset was that the botched investigation by the police resulted in his improper arrest and indictment because any of Cherry's other boyfriends was the murderer.  The discovery of Simon's DNA in the car did nothing but enhance his theory.  Accordingly, Jamie's first assignment of error is overruled.

*State v. Jamie,* 8th Dist. Cuyahoga No. 102103, 2015-Ohio-3583.  The Ohio Court of Appeals decision did not involve an unreasonable application of federal law as determined by the Supreme Court of the United States or an unreasonable determination of facts.  I recommend that the Court dismiss Ground One of Jamie's petition for lack of merit.

**B.**     **Grounds Two and Five**

Jamie has couched Grounds Two and Five as separate ineffective assistance of counsel claims, but they appear only to be variations on the theme of Ground One.  Ground Two asserts that the delayed disclosure of evidence denied Jamie effective assistance of counsel because his trial attorney was unable to adequately investigate and prepare his defense.  ECF Doc. 13, Page ID# 1440-1441.  Ground Five asserts that Jamie received ineffective assistance of counsel when his trial attorney poorly handled the state's mid-trial disclosure of "exculpatory" evidence.  ECF Doc. 13, Page ID# 1452.  Specifically, Jamie contends that his attorney should have requested a mistrial and/or talked to him about requesting a mistrial.  ECF Doc. 1, Page ID# 9.

The Sixth Amendment provides, in pertinent part, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense."  U.S. Const. amend. VI.  A defendant has a Sixth Amendment right not just to counsel but to "reasonably effective assistance" of counsel.  *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).  "The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged from the benefit of hindsight."  *Yarborough v. Gentry*, 540 U.S. 1, 8, 124 S. Ct. 1, 157 L. Ed. 2d 1 (2003).

To establish that his attorney was constitutionally ineffective, Jamie must demonstrate that (1) the attorney made such serious errors he was not functioning as "counsel" guaranteed by the Sixth Amendment; and (2) counsel's allegedly deficient performance prejudiced the defense. *Strickland,* 466 U.S. at 687.

Under the first *Strickland* prong, a petitioner must show that counsel's representation fell below an objective standard of reasonableness based on all the circumstances surrounding the case.  *Id*. at 688.  "Because of the difficulties inherent in making the evaluation, a court must

21

indulge a strong presumption that counsel's conduct falls within the wide range of reasonable

professional assistance; that is, the defendant must overcome the presumption that, under the

circumstances, the challenged action might be considered sound trial strategy." *Id*. at 689.  To

satisfy the second, "prejudice" *Strickland* prong, a petitioner must demonstrate that a "reasonable

probability" exists that, but for his counsel's errors, the outcome of the trial would have been

different.  *Id.* at 694.  "An error by counsel, even if professionally unreasonable, does not

warrant setting aside the judgment of a criminal proceeding if the error had no effect on the

judgment." *Smith v. Jago*, 888 F.2d 399, 404 (6th Cir. 1989), cert. denied, 495 U.S. 961, 110 S.

Ct. 2572, 109 L. Ed. 2d 754 (1990) (quoting *Strickland*, 466 U.S. at 691).

Because the Ohio Court of Appeals adjudicated Jamie's claims of ineffective assistance

of counsel on the merits, this court must give AEDPA deference to that adjudication.  *Perkins v.

McKee*, 411 Fed. App'x 822, 828 (6th Cir. 2011).  In addressing Jamie's claims, the Ohio Court

of Appeals correctly recognized that *Strickland* governs claims of ineffective assistance of

counsel, stating:

> {¶ 24}  To establish ineffective assistance of counsel, a defendant must
> demonstrate that counsel's performance fell below an objective standard of
> reasonable performance and that he was prejudiced by that deficient performance,
> such that, but for counsel's error, the result of the proceedings would have been
> different.  *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d
> 1038, ¶ 205, citing *Strickland v. Washington*, 466 U.S. 668, 687-688, 104 S. Ct.
> 2052, 80 L.Ed.2d 674 (1984).  In short, counsel's errors must be so serious as to
> render the result of the trial unreliable.  In evaluating a claim of ineffective
> assistance of counsel, a court must be mindful that there are countless ways for an
> attorney to provide effective assistance in a given case, and it must give great
> deference to counsel's performance.  *Id*. at 689.

> {¶ 25}  In his second assignment of error, Jamie contends that the state's failure
> to disclose Simon's DNA prior to trial rendered defense counsel ineffective
> because counsel was unable to adequately investigate and prepare for trial.  He
> argues further that the court "induced counsel's ineffectiveness by giving counsel
> the untenable choice of either exclusion of the DNA evidence or a retrial."  In his
> sixth assignment of error, Jamie asserts that he was denied effective assistance of

counsel because counsel did not request a mistrial in response to the state's alleged Brady violation regarding Simon's DNA.  These arguments are without merit.

{¶ 26}  First, as discussed above, it is apparent from the record that defense counsel was well aware of Simon before trial and prepared to present him as a suspect.  Second, the trial court did not induce any ineffective assistance of counsel.  Indeed, in response to the state's disclosure that Simon's DNA had been found in Cherry's car, the court asked counsel "what's your remedy?"  It is not apparent that the only possible alternatives were excluding the DNA or mistrial; counsel could have requested a short continuance to allow for further investigation of Simon.  Defense counsel acknowledged, however, that Simon's DNA in Cherry's car undoubtedly helped its case because, consistent with counsel's theory, it put someone other than Jamie in the backseat of the car.  Recognizing this, counsel opted for continuing with the trial.

{¶ 27}  Counsel's strategy from the outset of trial, even without the discovery of Simon's DNA, was to attack the police investigation that led to Jamie's arrest.  In opening statement, counsel argued that the police had decided early on that Jamie was the murderer, and then neglected to investigate other viable suspects, such as Simon, and another male with whom Cherry had a continuing relationship and who had been known to be violent with Cherry in the past.  Thus, the discovery mid-trial that Simon's DNA had been found in Cherry's car as early as 2013, and that Simon had never been investigated by the police, only enhanced Jamie's theory of the case.  Defense counsel made a strategic decision not to exclude Simon's DNA and to continue with the trial.  Trial tactics and strategies do not constitute a denial of effective assistance of counsel.  *State v. Gooden*, 8th Dist. Cuyahoga No. 88174, 2007-Ohio-2371, ¶ 38, citing *State v. Clayton*, 62 Ohio St.2d 45, 402 N.E.2d 1189 (1980).

{¶ 28}  Finding no ineffective assistance of counsel, Jamie's second and sixth assignments of error are overruled.

*State v. Jamie,* 8th Dist. Cuyahoga No. 102103, 2015-Ohio-3583.

Jamie has not demonstrated that the state court's determination was contrary to or an unreasonable application of clearly established federal law.  As recognized by the Ohio Court of Appeals, defense counsel was aware of Simon as a witness for the state and the trial court did not "induce" ineffective assistance of counsel.  Jamie contends that had his counsel known before trial that Simon's DNA was in the back seat of the car, he could have further investigated and developed a defense around Simon.  But Jamie's counsel was already asserting that defense.

During opening statement, defense counsel asserted that the police investigation had focused on the wrong person and ignored evidence suggesting different suspects.  ECF Doc. 9-2 at Page ID# 565-570.  The fact that Simon's DNA was discovered in the back seat of Cherry's car and was introduced at trial bolstered Jamie's defense.  Jamie does not explain how additional time or investigation would have furthered this defense.  Accordingly, considering the double layer of AEDPA deference afforded to state court determinations under *Strickland*, I recommend denial of habeas relief on Jamie's Ground Two Claim.

In Ground Five, Jamie argues that his attorney erred in not moving for a mistrial and/or consulting him on this issue.  ECF Doc. 1 at Page ID# 9.  Jamie's traverse also contends that his attorney failed to properly respond to mid-trial discovery of Simon's DNA evidence and failed to adequately argue that the evidence established an alibi.  ECF Doc. 13 at Page ID# 1455.  It was ultimately the trial court's decision whether to grant or deny a mistrial, even if defense counsel had sought one.  *Brock v. North Carolina,* 344 U.S. 424, 427 (1953), *citing Wade v. Hunter,* 336 U.S. 684, 690 (1949); *Thompson v. United States,* 155 U.S. 271, 273-274 (1894).  Here, the discovery of Simon's DNA did not violate Jamie's due process rights or prejudice the defense.  The fact that Simon's DNA was in the car actually buttressed defense counsel's arguments that: 1) the police had performed a poor investigation; and 2) that someone else committed the crime.  The state provided this evidence before Simon testified.  The court permitted defense counsel to interview Simon before he testified.  It is unclear what more defense counsel could have done in response to the evidence of Simon's DNA even if he had learned of this evidence before trial.  As suggested by Jamie's counsel during trial, it was highly unlikely that Simon was going to admit to killing Cherry simply because his DNA was in the car.  ECF Doc. 9-6, Transcript Page

24

1132-1133. Jamie has not overcome the presumption that trial counsel's decision to proceed with the trial rather than request a mistrial might be considered sound trial strategy.

Jamie also argues that his trial attorney failed to fully develop the alibi evidence and/or to argue it at trial. ECF Doc. 13 at Page ID# 1454-1455. It does not appear that Jamie raised this argument on direct appeal and it is most likely not exhausted. ECF Doc. 9-1 at Page ID# 145-146. Moreover, it is unclear how his trial attorney's assistance was ineffective in relation to the alibi evidence. According to Jamie, his girlfriend's testimony combined with the video footage at trial demonstrated that he had an alibi. The jury heard this evidence and, if they had believed it, could have found him not guilty on that basis. However, Lisha Robinson's testimony was equivocal. She estimated that she fell asleep around 1:00 a.m. on the night of the murder and did not know whether Jamie was with her or not. ECF Doc. 9-5 at Page ID# 1055. Jamie does not explain how his counsel provided ineffective assistance in this regard or how this prejudiced him at trial. In short, in regard to an undeveloped alibi evidence-ineffective assistance claim, Jamie can meet neither *Strickland* prong: he cannot show how his attorney fell below an objective standard of reasonableness based on all the circumstances surrounding the case, and he cannot show a "reasonable probability" that, but for his counsel's errors, the outcome of the trial would have been different. The jury heard the alibi contention and rejected it. Jamie offers nothing to suggest a more complete version of the story would probably have changed the verdict. As with Count Two, I recommend denial of habeas relief based on Jamie's Ground Five claim on the merits.

### C.    Ground Three

In Ground Three, Jamie asserts that the trial court denied him due process of law and a fair trial when it admitted "other acts" evidence. ECF Doc. 1 at Page ID# 6. Specifically, he

contends that the trial court should not have permitted Jamie's parole officer, Tony Luketic, to

testify at trial.  Mr. Luketic did not testify regarding any specifics of Jamie's prior bad acts.

However, Jamie asserts that because the jury learned he had a parole officer, they would have

been able to infer he was on parole for other criminal acts.

First, it is questionable whether the fact that Jamie had a parole officer was actually

evidence of "other crimes, wrongs, or acts" pursuant to Ohio R. Evid. 404(B).  Officer Luketic

gave no testimony of Jamie's other acts or explain why Jamie was on supervision.  ECF Doc. 9-4

at Page ID# 781-795.  Ohio R. Evid. 404(B) proscribes the admission of other acts evidence to

show the character of a person or to show action in conformity with character.  Because the jury

was not informed of Jamie's prior acts it is questionable whether Ohio R. Evid. 404(B) even

applied in this situation.  Jamie himself seems to question this by arguing that Officer Luketic's

testimony was either not relevant or unduly prejudicial and that Ohio R. Evid. 402 and 403

should have been applied to exclude the testimony.  ECF Doc. 13 at Page ID# 1447.

Second, even if testimony from Jamie's parole officer was necessarily evidence of prior

bad acts as Jamie argues, an argument premised on this issue is not a cognizable issue for federal

habeas review.  In overruling objections to Officer Luketic testifying, the trial judge applied

Ohio's rules of evidence.  But, "[e]rrors in application of state law, especially with regard to the

admissibility of evidence, are usually not cognizable in federal habeas corpus."  *Bugh v.*

*Mitchell,* 329 F.3d 496, 512 (6th Cir. May 12, 2003); citing *Walker v. Engle*, 703 F.2d 959, 962

(6th Cir.), cert. denied, 464 U.S. 962, 78 L. Ed. 2d 338, 104 S. Ct. 396 (1983); *see also Coleman*

*v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001) ("Because this is an appeal from a habeas corpus

decision and not an appeal from Coleman's state conviction, we do not pass upon errors in the

application of state law, especially rulings regarding the admission or exclusion of evidence."

(quoting *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988))).  The trial court applied state law in admitting the testimony of Officer Luketic, and Jamie's habeas petition argues that the admission of this evidence violated state law.  Because Ground Three argues the misapplication of state law only, it does present an issue cognizable on federal habeas review.

Jamie also complains that the trial court did not give a limiting instruction to the jury on the other acts testimony.  However, as argued by Warden Bracy, the Ohio Supreme Court has held that it is not plain error for the trial court to fail to give a limiting instruction on the use of other acts evidence.  Whether to request a limiting instruction sometimes raises tactical concerns, and the trial court has no duty to give this instruction *sua sponte*.  *State v. Schaim,* 65 Ohio St.3d 51, 61, n.9 (1992).  Moreover, the fact that the trial court did not give a limiting instruction does not alter the fact that this evidentiary ruling only involved an application of state law.  No federal question arises from Ground Three.

Finally, even if this issue were cognizable, this court must give AEDPA deference to the state appellate court's adjudication of it.  *Perkins v. McKee*, 411 Fed. App'x 822, 828 (6th Cir. 2011).  In addressing Jamie's claims, the Ohio Court of Appeals, applying the Ohio Rules of Evidence, stated:

> {¶ 29}  In his third assignment of error, Jamie contends that he was denied due process of law and a fair trial because the court improperly admitted other acts evidence under Evid. R. 404(B).  Specifically, he objects to Tony Luketic's testimony that he began supervising Jamie in August 2012 when he returned to Cleveland.  Jamie contends that although no mention was made during trial that he had been in prison, Luketic's testimony indicated to the jury that he was on parole for a prior conviction, thereby allowing the jury to use this evidence to conclude that he was of bad character.
>
> {¶ 30}  "Evidence that an accused committed a crime other than the one for which he is on trial is not admissible when its sole purpose is to show the accused's propensity or inclination to commit crime or that he acted in conformity with bad character."  *State v. Ceron*, 8th Dist. Cuyahoga No. 99388,

2013-Ohio-5241, ¶ 67, quoting *State v. Williams*, 134 Ohio St.3d 521, 2012-
Ohio-5695, 983 N.E.2d 1278, ¶ 15.  There are exceptions, however, to this rule.

{¶ 31}  Under Evid. R. 404(B), "[e]vidence of other crimes, wrongs, or acts is
not admissible to prove the character of a person in order to show action in
conformity therewith.  It may, however, be admissible for other purposes, such
as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or
absence of mistake or accident."  Hence, the rule affords the trial court broad
discretion regarding the admission of other acts evidence.  *Williams* at ¶ 17.

{¶ 32}  In determining whether other-acts evidence is to be admitted, trial courts
should conduct a three-step analysis.  The first step is to determine if the other-
acts evidence "is relevant to making any fact that is of consequence to the
determination of the action more or less probable than it would be without the
evidence" under Evid. R. 401.  The next step is to consider whether evidence of
the other crimes, wrongs, or acts is presented to prove the character of the
accused in order to show activity in conformity therewith, or whether the other-
acts evidence is presented for a legitimate purpose, such as those stated in Evid.
R. 404(B).  Finally, the court should consider whether the probative value of the
other-acts evidence is substantially outweighed by the danger of unfair prejudice.
*Williams* at ¶ 20, citing Evid. R. 403.

{¶ 33}  With respect to the first and second steps of the *Williams* analysis, we
find that the challenged testimony was relevant and offered for a legitimate
purpose, i.e., to show Jamie's motive for killing Cherry.  Luketic testified that
Jamie was put on his caseload when Jamie returned to Cleveland in August 2012.
He testified further that in early September 2012, Cherry, whose voice he
recognized, left him a voicemail containing information that could have led to
sanctions against Jamie.  Cherry was killed, however, before Luketic was able to
speak to him about the voicemail.  Jamie was aware that Cherry had called
Luketic because Cherry had advised Jamie via text that he had called his parole
officer.  Thus, Luketic's testimony, if believed by the jury, provided a possible
motive for Jamie to kill Cherry: he was upset that Cherry had called his parole
officer.

{¶ 34}  Regarding the third step of the *Williams* analysis, we find that the danger
of unfair prejudice did not substantially outweigh the probative value of the
challenged testimony.  Unfairly prejudicial evidence is that which might result in
an improper basis for a jury decision.  *Oberlin v. Akron Gen. Med. Ctr.,* 91 Ohio
St.3d 169, 172, 2001-Ohio-248, 743 N.E.2d 890.  Generally, "'unfairly
prejudicial evidence appeals to the jury's emotions rather than intellect.'
Weissenberger, Ohio Evidence (2000) 85-87, Section 403.3."  *Id.*  The
challenged evidence does not meet this standard.  Luketic's testimony proved
Jamie's possible motive for killing Cherry.

{¶ 35}  Furthermore, even if the other-acts evidence were improperly admitted, we would find its admission to be harmless because the outcome of the trial would have been the same even if the challenged testimony had not been admitted.  The state presented substantial evidence of Jamie's guilt, even without Luketic's testimony.  Bradford testified that Cherry had told him that he planned to tell Jamie's girlfriend about his relationship with Jamie, and Cherry told Jamie that he was going to tell people about them, providing another possible motive for Jamie to kill Cherry.  In addition, the state presented evidence that Jamie's DNA was found in Cherry's car on the rear of the driver's head rest, supporting the state's theory that Jamie strangled Cherry from behind as he sat in the driver's seat.  Jamie's DNA was also found under Cherry's fingernails, and Jamie had scratch marks on his right hand and left wrist, indicating that Cherry struggled with Jamie as he strangled him.  And finally, the state presented video evidence that Cherry picked Jamie up at his home on West 99th Street and drove back to the parking lot of his apartment complex, where Jamie strangled him before walking home.

{¶ 36}  Because the other-acts testimony was admissible under Evid. R. 404(B), the third assignment of error is overruled.

*State v. Jamie,* 8th Dist. Cuyahoga No. 102103, 2015-Ohio-3583.  The Ohio Court of Appeals decision did not involve an unreasonable application of federal law as determined by the Supreme Court of the United States or an unreasonable determination of facts.  I recommend that the Court dismiss Ground Three of Jamie's petition because it does not present an issue cognizable on habeas review and because it lacks merit.

**D.     Ground Four**

Ground Four asserts that the Cleveland Police Department's negligent and defective investigation deprived Jamie of his due process and equal protection rights.  ECF Doc. 1 at Page ID# 7.  Jamie cites information from the investigation that should have been further explored by the police.  However, he does not explain how the police's failure to further investigate this evidence and other suspects violated his constitutional rights.  He has not cited any case law recognizing such a claim on habeas review and the undersigned is unaware of any.

If this ground were construed as an insufficient evidence argument it would still fail. Evidence was introduced at trial that Jamie's DNA was under Cherry's fingernails and on the back of the headrest on Cherry's seat.  Jamie had small scratch marks on his hand and wrist several days after Cherry was strangled.  The jury was informed of possible motives that Jamie had to murder Cherry.  They also saw a video of Cherry picking someone up at the location where Jamie lived around 12:30 a.m. and, a half hour later, an individual with the same hairstyle as Jamie walking away from the crime scene.  The jury also heard the defense's theory and that the investigation should have been handled differently.  Nonetheless, after receiving the evidence and deliberating, the jury found Jamie guilty of murder.

Also, because the Ohio Court of Appeals already adjudicated Jamie's claim that the police negligently investigated the case on the merits, this court must give AEDPA deference to that adjudication.  *Perkins v. McKee*, 411 Fed. App'x 822, 828 (6th Cir. 2011).  In addressing Jamie's claim regarding the police investigation, the Ohio Court of Appeals stated:

> {¶ 42}  In his fifth assignment of error, Jamie contends that the negligent police investigation in this case deprived him of due process of law and equal protection.
>
> {¶ 43}  Upon cross-examination, Detective Diaz admitted that the police should have investigated Simon, although he testified that nothing from the police interviews or evidence from the coroner's office pointed to Simon as a suspect. He also admitted that the police never interviewed Gerald Felder, the last person to call Cherry, and with whom Cherry had a sexual relationship — because they could not find him.  He testified further that although the police looked for another man with whom Cherry previously had a relationship and who was known to have tried to choke Cherry in 2002, they could not find him and never spoke with him.  Jamie contends that this "negligent investigation compromised the entire process and deprived him of any real ability to have a fair trial."  We disagree.
>
> {¶ 44}  Although Diaz admitted that the police should have interviewed Simon, the evidence demonstrated, contrary to Jamie's assertions, that the police tried to talk to Felder and the other male but could not find them.  They did not pursue them because all of the evidence pointed to Jamie as the murderer.  We do not

> find this to be negligence, or somehow a denial of due process or equal
> protection.  The police investigation produced significant evidence of Jamie's
> involvement in the murder, and his assertion of police incompetence does not
> change the evidence against him.  That evidence was presented to the jury, who
> found him guilty.  As discussed above, his convictions were supported by the
> weight of the evidence.  Accordingly, the fifth assignment of error is overruled.

*State v. Jamie,* 8th Dist. Cuyahoga No. 102103, 2015-Ohio-3583.  The Ohio Court of Appeals decision did not involve an unreasonable application of federal law as determined by the Supreme Court of the United States or an unreasonable determination of facts.  I recommend that the Court dismiss Ground Four of Jamie's petition because it does not present an issue cognizable on habeas review and because it lacks merit.

> **E.**      **Ground Six**

Respondent argues that Ground Six of Jamie's petition is noncognizable and procedurally defaulted.  ECF Doc. 9 at Page ID# 62-63.  Jamie requests permission to withdraw Ground Six. He acknowledges that he failed to properly exhaust this claim in state court.  ECF Doc. 9 at Page ID# 1456.  The undersigned recommends that this claim be dismissed because it is noncognizable, procedurally defaulted, and because Jamie has requested to withdraw it.

**VII.    Certificate of Appealability**

As amended by the Antiterrorism and Effective Death Penalty Act, 28 U.S.C. § 2253(c)(1) provides that a petitioner may not appeal a denial of an application for a writ of habeas corpus unless a judge issues a certificate of appealability.  The statute further provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

Although the statute does not define what constitutes a "substantial showing" of a denial of a constitutional right, the burden on the petitioner is obviously less than the burden for establishing entitlement to the writ; otherwise, a certificate could never issue.  Rather, the courts

that have considered the issue have concluded that "'[a] substantial showing requires the applicant to "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further."'"  *Hicks v. Johnson*, 186 F.3d 634, 636 (5th Cir. 1999) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir. 1996)(quoting *Barefoot v. Estelle*, 463 U.S. 880, 893, n. 4 (1983)); *accord Slack v. McDaniel*, 529 U.S. 473, 483-484 (2000).  The statute requires that certificates of appealability specify which issues are appealable.  28 U.S.C. § 2253(c)(3).

Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), 28 U.S.C. foll. § 2254.  The rule tracks the requirement of § 2253(c)(3) that any grant of a certificate of appealability "state the specific issue or issues that satisfy the showing required by § 2253(c)(2)," Rule 11(a).  In light of the Rule 11 requirement that the Court either grant or deny the certificate of appealability at the time of its final adverse order, a recommendation regarding the certificate of appealability issue is included here.

Here, the state court of appeals decision addressed each of Jamie's grounds on the merits. Jamie has failed to show any unreasonable application of Federal law or any unreasonable determination of facts.  Habeas relief is not available for the issues identified in Jamie's petition; this is not debatable among jurists of reason.  For these reasons, I recommend that no certificate of appealability issue in this case.

## VIII.  Conclusion

Because Jamie has presented only noncognizable and meritless claims, I recommend that

the Court DISMISS Jamie's petition for writ of habeas corpus (ECF Doc. 1) in its entirety.

Dated: August 13, 2018

Thomas M. Parker

United States Magistrate Judge

---

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of
Courts within fourteen (14) days after being served with a copy of this document.  Failure to file
objections within the specified time may waive the right to appeal the District Court's order.  See
*U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn,* 474 U.S. 140 (1985),
reh'g denied, 474 U.S. 1111 (1986).