PEARSON, J.

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| MAJOR D. JAMIE, | ) | CASE NO. 1:16-CV-2712 |
| | ) | |
| Petitioner, | ) | |
| | ) | JUDGE BENITA Y. PEARSON |
| v. | ) | |
| | ) | |
| ED SHELDON, Warden. | ) | **ORDER** |
| | ) | [Resolving ECF Nos. 15, 20] |
| Respondent. | ) | |

Pending before the Court is Petitioner Major D. Jamie's Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (ECF No. 1), alleging six grounds for relief. The case was referred to Magistrate Judge Thomas M. Parker for a Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.2(b)(2). The magistrate judge subsequently issued a report (ECF No. 15) recommending that the Court deny the petition because Petitioner's claims are meritless and/or non-cognizable under § 2254. Petitioner filed objections (ECF No. 20).

For the following reasons, Petitioner's objections are overruled, the Report and Recommendation is adopted, and the petition is dismissed.

## I. Background

Petitioner is currently incarcerated at the Mansfield Correctional Institution[1], having been

---

[1] According to the Ohio Department of Rehabilitation & Correction website (https://appgateway.drc.ohio.gov/OffenderSearch/Search/Details/A661711 (last visited March 24, 2020)), Petitioner is currently confined at the Mansfield Correctional Center. The Warden of that institution, Ed Sheldon, has been substituted for Charmaine Bracy.

found guilty on September 24, 2014 of kidnapping, murder, and felonious assault. ECF No. 9-1 at PageID #: 112. On October 8, 2014, Petitioner was sentenced to 15 years to life in prison. *Id.* at PageID #: 119. On October 23, 2014, Petitioner filed a notice of appeal in the Ohio Court of Appeals. *Id.* at PageID #: 121. On September 3, 2015, Ohio's Eighth District Court of Appeals denied Petitioner relief on all six assignments of error asserted, affirming the judgment of the trial court. *Id.* at Page ID #: 176-98. On October 19, 2015, Petitioner filed a timely notice of appeal to the Ohio Supreme Court. *Id.* at PageID #: 200. On December 30, 2015, the Ohio Supreme Court declined to accept jurisdiction over Petitioner's appeal. *Id.* at PageID #: 244.

On direct appeal, Ohio's Eighth District Court of Appeals established the factual background of Petitioner's trial and convictions as follows:

> {¶ 3} The evidence at trial demonstrated that on September 15, 2012, a maintenance worker at the Boulevard Terrace Apartments located near Madison Avenue and West Boulevard in Cleveland, Ohio, discovered the lifeless body of Robert Cherry slumped in the front seat of his car in the apartment complex parking lot. Cleveland police officers responded to the scene. One of the officers noticed that the body had small nick marks on the neck, although the body did not show other outward signs of violence. Personnel from the coroner's office removed the body and conducted an autopsy.
>
> {¶ 4} Dr. Krista Timm, forensic pathologist for the Cuyahoga County medical examiner's office, performed the autopsy. She testified that she noted abrasions on Cherry's neck and small hemorrhages in the soft tissue around the eyes caused by compression of blood vessels in the neck. Dr. Timm reported that her internal examination of the body revealed injuries to the neck, including fractures of the hyoid bone and hemorrhages around the fractures. She opined that the cause of death was homicide, and the manner was asphyxia by cervical compression. Dr. Timm testified that Cherry's injuries could have been due to strangulation by hand; she testified further that Cherry could have caused the nicks to his neck as he was trying to defend himself.
>
> {¶ 5} Kenneth Bradford testified that he and Cherry had been romantically involved in the late 1980s, but remained best friends after their romantic

relationship ended. Bradford testified that at the time of his death, Cherry's "main boyfriend" was Jamie, although he was also dating Donald "Tank" Simon, and a man named Heidi. Bradford said that Cherry had told him that Simon was upset because Cherry was ending their relationship to be with Jamie. Bradford said that Cherry was in love with Jamie and initially excited when Jamie returned to Cleveland in August 2012, but their relationship quickly became "rocky" because Jamie also had a girlfriend.

{¶ 6} Jamie and his girlfriend, Lisha Robinson, lived on West 99th Street in Cleveland, only a few blocks away from Cherry's apartment. Bradford testified that Cherry told him that he planned to tell Robinson about his relationship with Jamie. Robinson testified that she knew nothing about Cherry when she lived with Jamie, and only learned of his sexual preference in June 2014, when she watched "The First 48," a television program about the police investigation of Cherry's murder.

{¶ 7} On the evening of September 14, 2012, Bradford, his friend Ulysses Tyler, and Cherry went to the home of Gloria and Jeffrey Monday to socialize and drink. According to Gloria, Cherry spoke with Jamie by telephone once during the evening. Bradford said that he, Tyler, and Cherry left the gathering at approximately 12:30 to 1:00 a.m. on September 15, 2012. Bradford testified that Cherry had told him several times that he was going to meet Jamie later to celebrate his birthday.

{¶ 8} Cleveland police detective Raymond Diaz testified that he began investigating the murder on September 17, 2012. Upon searching Cherry's apartment, the police found a letter from Jamie dated August 8, 2011, signed "your man and husband, Major Jaime," and a handwritten note containing the name and telephone number of Jamie's parole officer on the night stand in the bedroom. The police also found a calendar hanging on the bedroom wall that contained handwritten entries for August 25, 2012 through August 31, 2012, and September 1, 2012 through September 4, 2012. Jamie was shown the calendar when he was interrogated and identified the calendar and the writing on it as Cherry's. The entries on the calendar detail Cherry's feelings about the days in question and show that his relationship with Jamie deteriorated quickly after August 25, 2012. The last entry, dated September 4, 2012, states that Cherry called the police about Jamie to report "what he's doing and what he did in jail and where he's living lot's of drugs."

{¶ 9} Diaz testified that after interviewing Bradford, the police began investigating Jamie. Tom Ciula, the forensic video and audio specialist for the Cleveland police department, obtained surveillance videos from 11:45 p.m.,

(1:16-CV-2712)

September 14, 2012, to 4:00 p.m., September 15, 2012, from six locations near the Boulevard Terrace Apartments, including the CVS store on the east corner across the street from Cherry's apartment, a pawn shop on the southeast corner, and Cleveland Fire Station No. 23, located at 9826 Madison Avenue in Cleveland. Ciula put the videos from the various locations together to create a timeline of events from 12:13 a.m. to 1:38 a.m.

{¶ 10} The video showed that at approximately 12:14 a.m., a vehicle similar to Cherry's turned from Madison Avenue into the driveway of the Boulevard Terrace Apartments. About four minutes later, the same vehicle came back out of the driveway and turned eastbound on Madison Avenue. At approximately 12:29 a.m., the same vehicle turned south onto West 99th Street. Six minutes later, the same vehicle came up West 100th Street, turned westbound onto Madison Avenue and then turned into the apartment complex driveway and went behind the apartment building. At 1:08 a.m., a male walked from the apartment complex parking lot across West Boulevard, and then headed east on Madison Avenue. The male subsequently crossed to the south side of Madison Avenue, walked through a park located at the end of West 99th Street, and then walked up West 99th Street.

{¶ 11} Diaz testified that he believed the car in the video sequence was Cherry's because the driver in the video was wearing a white hat, which the police later found in his car. Diaz also testified that upon his review of the video, he saw one person in the car when it initially headed east on Madison Avenue toward West 99th Street, but two people in the car when it returned to the apartment complex. Jamie's girlfriend Lisha Robinson testified that the quickest way to her house from Madison Avenue was to cut through the park at the end of the street, and acknowledged that the figure in the video was walking in the direction of her house. She also testified that the figure in the video had dreadlocks, and that Jamie had dreadlocks at the time of the murder. Diaz testified that when the police interviewed Jamie on September 20, 2012, they observed scratch marks on his right hand and left wrist.

{¶ 12} Diaz testified that Cherry's cell phone records indicated that all outgoing activity from Cherry's phone stopped on September 15, 2012, at 12:43 a.m. The text messages also demonstrated that Cherry and Jamie's relationship quickly deteriorated after Jamie returned to Cleveland. For example, on August 29, 2012, Cherry texted Jamie, "Same old shit Major. U played wit my feelings again and used me for ur come up. Its cool. See u in a minute wit all ur shit. I want my keys and phone. Be wit her." When Jamie responded that he would be home soon, Cherry texted, "No, I mean wat I said dude. U still da asshole from before. I don't want to argue or fight. Just do u leave me alone. I want my shit. Nothing

4

else. Please." On August 31, 2012, Cherry texted Jamie that "U lie about everything. U see how u do me. After three years why do I have to be dogged by u for people who was not there for u. I am not doing good man." Jamie responded, "U trippin about nothing. I will be home!" Within five minutes, Cherry texted Jamie, "No, I am not tripping. U will see tonight how I can trip u when u get here. I will call da police. I ask u not to fuck wit me, didn't I." The following day, September 1, 2012, Jamie texted Cherry that he would see him when he got off work. Cherry responded, "I am prepared to die this morning on everything I love. U coming out or I am coming in. I am telling it all in front of them all." The texts reflect that on September 2, 2012, Cherry put Jamie's belongings on Jamie's girlfriend's porch and then told him, "U have wat u want. Be happy. Give my keys and phone. If no phone goes off at 3 today. I talked to police already. Told them all. U are not suppose to be here. No way." When Jamie responded, "Whatever! Kick Rocks Hoe!", Cherry texted him, "Da police told me to call ur PO and tell him what I told them cause I am afraid for my life. They will pick you up now. Whos da hoe." Diaz pointed out in his testimony that this text corresponded with Cherry's September 2, 2012 notation on his calendar of "Night. Called me. Told me to kick rocks. Why. My turn. Police."

{¶ 13} Tony Luketic, Jamie's parole officer, testified that he began supervising Jamie in August 2012 when he returned to Cleveland. He said that on September 6 or 7, 2012, he received a voicemail from Cherry in which Cherry advised him of something that would have been a violation of Jamie's parole. Luketic returned Cherry's call but was unable to reach him. Luketic said that he recognized the voice as Cherry's because he had spoken with Cherry in mid-August 2012 to advise him why Jamie's placement with Cherry had been denied.

{¶ 14} Carey Baucher, a DNA analyst in the Cuyahoga County's medical examiner's office, testified regarding various DNA samples obtained from Cherry's car. The DNA swab from under the fingernails of Cherry's left hand was a mixture of Cherry and Jamie's DNA. Jamie's DNA was also found in a swab from the rear of the driver's seat headrest. Baucher also identified a DNA sample retrieved from the right rear door interior handle as belonging to Simon. She testified that during her investigation in 2013, she had submitted the sample to the Ohio DNA database (CODIS) and received a match to Simon. She emailed the Cleveland police department several times in May and June 2013 requesting either a DNA standard from Simon or an acknowledgment that he was not a suspect, but received no response to her request.

{¶ 15} Simon testified that he met Cherry in 2011 and was not surprised that his DNA was found in Cherry's car because he had been in the car "a lot." He said that he and Cherry were not in love with each other, although they would sometimes drink too much and then sleep together. At the time of the murder, he

(1:16-CV-2712)

lived with his girlfriend, who knew nothing about Cherry. He denied killing Cherry and testified that he last saw him two weeks before he was murdered.

{¶ 16} On cross-examination, Simon admitted that he was never interviewed in 2012 about Cherry's murder. He also admitted that on September 8, 2012, about a week before his death, Cherry called him 38 times from 9:41 p.m. Friday evening to 5:00 a.m. Saturday morning. Simon testified that most of these calls were probably voicemails, however, and that he only called Cherry back twice during that period. Simon testified further that he knew Cherry was in love with Jamie and insisted he was not upset when he learned that Jamie was returning to Cleveland in August 2012. He denied that Cherry ever threatened to divulge their sexual relationship to his girlfriend or to his mother, Gloria Monday, or stepfather, Jeffrey Monday.

{¶ 17} The defense rested without presenting any witnesses. After the trial court granted Jamie's Crim.R. 29 motion in part and dismissed Count 2 (aggravated murder), the jury found him not guilty of aggravated murder (Count 1) but guilty of kidnapping, murder, and felonious assault (Counts 3, 4, and 5). The trial court sentenced him to 15 years to life in prison, and this appeal followed.

*Id*. at PageID #: 176-230.

Petitioner, challenging his conviction, filed the instant habeas corpus petition on November 7, 2016, asserting six grounds for relief:

**Ground One**: Petitioner was denied due process under the Fifth and Fourteenth Amendments when the State withheld evidence favorable to the defense.

**Ground Two**: The conduct of the State and the court below induced ineffective assistance of counsel and thereby deprived the Petitioner of his rights guaranteed by the Sixth and Fourteenth Amendments.

**Ground Three:** The Petitioner was denied due process of law and a fair trial as guaranteed by the Sixth and Fourteenth Amendments to the U.S. Constitution due to admission of damaging "other acts" evidence.

**Ground Four:** The admittedly negligent investigation by the Cleveland Police Department in this case compromised the entire

6

(1:16-CV-2712)

> prosecution and deprived the Petitioner of his due process and equal protection of law.
>
> **Ground Five:** Petitioner was denied the effective assistance of counsel due to the failure of counsel to request a mistrial based on the state's discovery violation, or to have presented the client with the option of requesting a mistrial.
>
> **Ground Six:** Petitioner puts forth a claim of actual innocence based on evidence that was not presented to the jury, but should have been. The failure to present the evidence to the jury deprived Petitioner of a fair trial and resulted in his wrongful conviction.

ECF No. 1 at PageID #: 1-10.

In his Traverse (ECF No. 13), Petitioner withdrew his sixth ground for relief.

Magistrate Judge Parker concluded that Petitioner's claims are either non-cognizable on habeas review or meritless, and, for those reasons, recommended that the petition be dismissed in its entirety. *See* ECF No. 15 at PageID #: 1502.

**II. Standard of Review for a Magistrate Judge's Report and Recommendation**

When objections have been made to the magistrate judge's Report and Recommendation, the District Court standard of review is de novo. Fed. R. Civ. 72(b)(3).

A district judge:

> must determine de novo any part of the magistrate judge's disposition that has been properly objected to. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions.

*Id*.

(1:16-CV-2712)

### III. Law & Analysis

Pursuant to 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a writ of habeas corpus may not be granted unless the state court proceedings: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d)(1)-(2); *see also Harris v. Stovall*, 212 F.3d 940, 942 (6th Cir. 2000), *cert. denied*, 532 U.S. 947 (2001).

A federal court may review a state prisoner's habeas petition only on the grounds that the challenged confinement violates the Constitution, laws or treaties of the United States. 28 U.S.C. § 2254(a). A federal court may not issue a writ of habeas corpus "on the basis of a perceived error of state law." *Pulley v. Harris*, 465 U.S. 37, 41 (1984); *see also Smith v. Sowders*, 848 F.2d 735, 738 (6th Cir. 1988). Because state courts are the final authority on state-law issues, the federal habeas court must defer to and is bound by the state court's rulings on such matters. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *see also Cristini v. McKee*, 526 F.3d 888, 897 (6th Cir. 2008) ("[A] violation of state law is not cognizable in federal habeas [] unless such error amounts to a fundamental miscarriage of justice or a violation of the right to due process in violation of the United States Constitution.").

(1:16-CV-2712)

**A. Objections to the Report and Recommendation**

**1. Ground One**

In ground one of his habeas petition, Petitioner asserts that his due process rights under *Brady v. Maryland*, 373 U.S. 83, 87 (1963) were violated when evidence favorable to his defense was not provided by the prosecution until trial. ECF No. 1 at PageID #: 4. Specifically, Petitioner contends that the prosecution's delay in providing DNA evidence prevented him from preparing a defense. *Id*.

The state appellate court record reflects that, in the middle of trial, the prosecution informed both the trial court and defense counsel that it had just learned of another[2] DNA sample found at the scene of the crime. The sample was recovered from the backseat of the vehicle in which Robert Cherry, the victim, was killed. ECF No. 9-1 at PageID #: 230. The DNA sample was identified as belonging to Donald "Tank" Simon. *See Id*. at PageID #: 186-87. In a lengthy discussion with the trial court following this disclosure, defense counsel acknowledged that the discovery of Simon's DNA bolstered its defense, but argued that they would have investigated Simon more fully had they known his DNA was found at the scene of the crime. *Id* at PageID #: 230. In response, the trial court asked defense counsel: "So what's your remedy? Do you want it excluded or a mistrial and you want to start over?" *Id*. Defense counsel did not seek to exclude

---

[2] Petitioner's DNA had previously been recovered from the body of the victim and from within the victim's vehicle. Prior to trial, Petitioner's DNA was the only DNA determined to have been found at the scene of the crime. *See* ECF No. 9-1 at PageID #: 194.

(1:16-CV-2712)

the evidence nor was a mistrial requested. *Id*. Counsel asked for, and the trial court granted, latitude in questioning witnesses about Simon. *Id*.

On direct appeal, after examining the trial court record, the Ohio Court of Appeals determined that a *Brady* violation did not occur. *Id*. The appellate court reasoned that Simon's DNA sample was disclosed in time for defense counsel to make use of it during trial. *Id*.

In the Report and Recommendation, the magistrate judge similarly found that Petitioner's claim lacked merit. ECF No. 15 at PageID #: 1489. The magistrate judge reasoned that an earlier disclosure of Simon's DNA sample would not have put the case against Petitioner in such a different light as to change the outcome. *Id*. at PageID #: 1487. In other words, the late disclosure did not "undermine confidence in the [jury's] verdict." *See Kyles v. Whitley*, 514 U.S. 419, 435 (1995). Petitioner objects to the magistrate judge's finding, arguing that the magistrate judge analyzed the facts under an inappropriate legal standard.

**(i) Jurisprudence Regarding *Brady* Evidence**

The government must disclose to a criminal defendant any evidence in its possession that is favorable to the defendant and material to guilt or punishment. *See Brady*, 373 U.S. at 87. Failure to do so violates a defendant's due process rights under the Fifth Amendment to the United States Constitution. *Id*. Both impeachment evidence and exculpatory evidence implicate the government's disclosure duty. *See Giglio v. United States*, 405 U.S. 150, 154 (1972).

A *Brady* violation occurs when (1) evidence was suppressed; (2) the evidence was favorable to the defense; and (3) the evidence was material to guilt or punishment. *See Jones v. Bagley*, 696 F.3d 475, 486 (6th Cir. 2012). Evidence is "material" if there is a reasonable

10

probability that, but for the prosecution's failure to disclose the evidence, "the result of the proceeding would have been different." *Kyles*, 514 U.S. at 433-34 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). A defendant can demonstrate a "reasonable probability" of a different result if the government's suppression of evidence "undermines confidence in the outcome of the trial." *Id*. By contrast, the mere possibility of a more favorable result for the defendant is insufficient to establish materiality. *See Strickler v. Greene*, 527 U.S. 263, 291 (1999).

The principles announced in *Brady* generally do not apply to "tardy" or "delayed" disclosure of exculpatory information, but only to a "complete failure to disclose." *United States v. Ross*, 703 F.3d 856, 881 (6th Cir. 2012) (citing *United States v. Davis*, 306 F.3d 398, 421 (6th Cir. 2002). The prosecution must only disclose impeachment material "in time for use at trial." *United States v. Crayton*, 357 F.3d 560, 569 (6th Cir. 2004).

When impeachment evidence is disclosed during trial, the Sixth Circuit has held that there is no *Brady* violation if the defendant was not prejudiced by the delay in disclosure. *See Id*.; *United States v. Word*, 806 F.2d 658, 665 (6th Cir. 1986) ("If previously undisclosed evidence is disclosed, as here, during trial, no *Brady* violation occurs unless the defendant has been prejudiced by the delay in disclosure."). Moreover, when the trial court takes responsive remedial measures to reduce or eliminate any prejudice, dismissal is not warranted. *See Joseph v. Coyle*, 469 F.3d 441, 472 (6th Cir. 2006) (holding that prejudice to the defendant was sufficiently reduced by the district court allowing defense counsel several days to review the belatedly disclosed impeachment evidence, and also by giving relevant instructions to the jury).

(1:16-CV-2712)

When defense counsel does not object to the delayed disclosure nor request a continuance in order to review the materials, there is no prejudice to the defendant. *See Crayton*, 357 F.3d at 569; *United States v. Holloway*, 740 F.2d 1373, 1381 (6th Cir. 1984) ("[C]ounsel for [the defendant] made no request for . . . a continuance. In such a circumstance, we conclude that the timing of the disclosure did not prejudice [the defendant].").

**(ii) Analysis**

The prosecution's disclosure of Simon's DNA sample, in the middle of trial, was not a *Brady* violation. It was not a *complete failure* to disclose (*Ross*, 703 F.3d at 881), and Petitioner did not suffer prejudice from the delay in receiving the evidence. The trial court offered defense counsel remedial measures by allowing counsel the opportunity to pursue a mistrial or any other remedy it felt was appropriate. *See* ECF No. 9-1 at PageID #: 186. Defense counsel chose broader cross examination as the remedy and chose to proceed with trial. In doing so, defense counsel used the newly revealed evidence as part of its trial strategy: to poke holes in the prosecution's case and further indicate to the jury that law enforcement and the prosecution rushed to judgment against Petitioner. *See Id.* at PageID #: 233. Petitioner has failed to present the Court with any information that would have "arguably changed the outcome of trial." *Davis*, 306 F.3d at 421.

The Court may not grant habeas relief on a claim that was adjudicated on the merits in state court unless the state court's decision was contrary to, or involved an unreasonable application of clearly established federal law. *See Coley v. Bagley*, 706 F.3d 741, 748 (6th Cir. 2013). The Ohio Court of Appeals' resolution of this issue--in making a finding that there was

12

(1:16-CV-2712)

no *Brady* violation--was not contrary to or an unreasonable application of clearly established federal law as determined by the Supreme Court. *See id*.

Accordingly, ground one is dismissed for lack of merit.

**2. Grounds Two and Five**

In Petitioner's second and fifth grounds for relief he contends his trial attorney was constitutionally ineffective. ECF No. 1 at Page ID #: 5, 9. In the Report and Recommendation, the magistrate judge recommends that grounds two and five be dismissed on the merits. ECF No. 15 at PageID #: 1494. Petitioner objects to the magistrate judge's recommendation, asserting that the magistrate judge improperly dismissed Petitioner's asserted examples of constitutionally ineffective assistance as trial tactics. ECF No. 20 at PageID #: 1516. The Court conducts its own examination of the record and the applicable law.

The right to counsel guaranteed by the Sixth Amendment is the right to effective assistance of counsel. *McMann v. Richardson*, 397 U.S. 759, 771 (1970). The standard for reviewing a claim of ineffective assistance of counsel is twofold. First, the defendant must show that counsel's performance was deficient. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. *Id*. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial--a trial whose result is reliable. *Id*.; *see also Blackburn v. Foltz*, 828 F.2d 1177 (6th Cir. 1987). "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's

(1:16-CV-2712)

conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689.

To establish prejudice, it must be shown that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different. *Id*. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 697. Because Petitioner must satisfy both prongs of the *Strickland* test to demonstrate ineffective assistance of counsel, if the Court determines that Petitioner has failed to satisfy one prong, it need not consider the other. *See id*.

### (i) Ground Two

In ground two, Petitioner asserts that the prosecution's delayed disclosure of Donald Simon's DNA sample denied his trial counsel the opportunity to develop a defense. ECF No. 1 at PageID #: 5. Specifically, Petitioner argues that by denying defense counsel the ability to adequately investigate the evidence, the conduct of both the prosecution and the trial court "induced ineffective assistance of counsel." *Id*.

Despite Petitioner's assertions, he has not shown that the prosecution's delayed disclosure of the DNA sample resulted in ineffective assistance of counsel in this case. Defense counsel was aware of Donald Simon before trial and had prepared to present him as a suspect whom the prosecution had not investigated. *See* ECF No. 9-1 at PageID #: 234. Defense counsel was also given the opportunity, by the trial court, to seek a mistrial or some other remedy once the disclosure was made. *Id*. at PageID #: 230. Defense counsel chose to continue with trial using

14

(1:16-CV-2712)

Simon's DNA sample and the leverage of delayed production to the defense's advantage. *Id*. at PageID #: 235. Finally, the record does not indicate and Petitioner does not suggest what, if anything, trial counsel would have been able to do with Simon's DNA sample had it been provided earlier.

Accordingly, because Petitioner fails show deficient performance and resulting prejudice under *Strickland*, ground two is denied on the merits.

### (ii) Ground Five

In ground five, Petitioner asserts that his trial attorney provided ineffective assistance of counsel when he failed to request a mistrial after the prosecution's tardy disclosure of Simon's DNA sample. ECF No. 1 at PageID #: 9.

Upon a review of the record, the Court finds that defense counsel's conduct did not fall below an objective standard of reasonableness. Counsel's choice to decline a mistrial, seize the moment, and capitalize on the prosecution's concession that another's DNA had been found in the victim's vehicle was a reasonable "strategic decision" clearly within his discretion. *See Strickland*, 466 U.S. at 689; *see also West v. Berghuis*, 716 F. App'x 493, 497 (6th Cir. 2017) ("[C]onsiderable latitude is given with regard to the strategic decisions of trial counsel.").

Moreover, even if defense counsel's trial strategy were determined to have fallen below an objective standard of reasonableness, counsel would not be deemed constitutionally ineffective because any failure on counsel's part did not prejudice Petitioner. The prejudice inquiry requires Petitioner to "show that there is a reasonable probability that, but for counsel's

15

unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Petitioner has not met this burden and the Court is not convinced that Petitioner would have received a "more favorable" outcome. *West,* 716 F. App'x at 497. At trial, the evidence against Petitioner was overwhelming. A swab taken from underneath the fingernails of the victim's left hand contained Petitioner's DNA. ECF No. 9-1 at PageID #: 184. A swab taken from the rear of the driver's seat headrest also contained Petitioner's DNA. *Id*. An autopsy determined that Cherry died from strangulation. *Id*. at PageID #: 179. Shortly after his body was discovered, Petitioner was found to have scratch marks located on his arms. *Id*. at PageID #: 182. In addition to video footage revealing Petitioner's presence at the scene of the crime, the prosecution produced substantial evidence of a souring relationship between Petitioner and Cherry and established a strong motive for Petitioner to kill Cherry. *See id*. at PageID #: 237.

Accordingly, having reviewed Petitioner's fifth ground for relief, the Court finds that Petitioner is unable to establish an ineffective assistance of counsel claim. Ground five is therefore dismissed on the merits.

### 3. Ground Three

In his third ground for habeas relief, Petitioner asserts that he was denied due process when the state trial court admitted "other acts" evidence against him. ECF No. 1 at PageID #: 6. Petitioner's claim is based upon Ohio Rule of Evidence 404(B) which proscribes the admission of other acts evidence to show the character of a person or to show action in conformity with a person's character. Evid. R. 404(B). Petitioner alleges that when the trial court allowed his parole officer to testify and be identified as Petitioner's parole officer, he was prejudiced because

(1:16-CV-2712)

jurors were able to infer that he was on parole for other criminal acts. ECF No. 13 at PageID #: 1446.

The state court record establishes that the evidence of Petitioner's parole officer was admissible under a state evidentiary exception[3] for the purpose of demonstrating motive.[4] *See* ECF No. 9-1 at PageID #: 193, 237. On appeal, the Ohio appellate court resolved this claim against Petitioner solely on the basis of Ohio law. *See Id*. at PageID #: 191-95. The appellate court afforded the trial court broad discretion in admitting the evidence under the state evidentiary exception. *See id*. at PageID #: 192. The appellate court also found that any danger of unfair prejudice did not substantially outweigh the probative value of the challenged testimony. *See id*. at Page ID #: 237-38.

The magistrate judge found Petitioner's third claim to be non-cognizable on habeas review and also meritless. ECF No. 15 at PageID #: 1498. Petitioner objects to the magistrate judge's findings and asserts that the magistrate judge gave too much deference to the state appellate court's findings and failed to properly review whether the 404(B) evidence was admissible. *See* ECF 20 at PageID #: 1519.

---

[3] Under Evid. R. 404(B) evidence of other crimes, wrongs, or acts is admissible for other purposes such as motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

[4] The trial court allowed evidence that Petitioner was on parole at the time of Cherry's death and that Cherry had informed Petitioner's parole officer, shortly before he was killed, of sanctionable offenses against Petitioner. The evidence was therefore admitted to show that Petitioner had a motive for killing Cherry. *See* ECF No. 9-1 at PageID #: 237.

17

(1:16-CV-2712)

A federal court sitting in habeas review is limited to deciding whether a state court conviction violates the Constitution, laws or treaties of the United States. *Estelle*, 502 U.S. at 68. Habeas relief, however, is not available for errors of state law. *Id*. It is well-settled that trial court errors in the application of state evidentiary law generally are not cognizable as grounds for federal habeas relief. *See Estelle*, 502 U.S. at 62, 67; *Serra v. Michigan Dep't of Corr.*, 4 F.3d 1348, 1354 (6th Cir. 1993). Only when a state evidentiary ruling is "so egregious that it results in a denial of fundamental fairness," may it violate due process and warrant federal habeas relief. *See Bugh v. Mitchell,* 329 F.3d 496, 512 (6th Cir. 2003); *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) ("[S]tate-court evidentiary rulings cannot rise to the level of due process violations unless they 'offend[ ] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'").

While the Supreme Court has found "no question that propensity would be an 'improper basis' for conviction," *Old Chief v. United States*, 519 U.S. 172, 182 (1997), it has declined to hold that similar "others-acts" evidence is so extremely unfair that its admission violates fundamental conceptions of justice. *See Bugh*, 329 F.3d at 512. The trial court's decision to admit evidence that Petitioner was on probation, as evidence of motive, was "far from an unreasonable determination of the facts in light of the evidence presented." *See Clark v. O'Dea,* 257 F.3d 498, 502 (6th Cir. 2001) (quotations omitted); *see also Bugh*, 329 F.3d at 512. No constitutional violation resulted.

Accordingly, Petitioner is not entitled to habeas relief on his third ground as it is non-cognizable and does not rest on any recognized federal constitutional right.

18

(1:16-CV-2712)

### 4. Ground Four

In ground four, Petitioner asserts that the Cleveland Police Department conducted a negligent and defective investigation, resulting in violation of his right to due process. ECF No. 1 at PageID #: 7. The magistrate judge recommends that the Court dismiss ground four as non-cognizable and that, in the alternative, it also be denied for lacking merit. ECF No. 15 at PageID #: 1499-1500. In his objections to the magistrate judge's Report, Petitioner merely repeats and refers to arguments that were presented in his Traverse. *See* ECF No. 13 at PageID #: 1448-52; ECF No. 20 at PageID #: 1524-25. All argument were fully addressed by the magistrate judge. *See* ECF No. 15 at PageID #: 1498-1500. The Federal Magistrates Act requires a district court to conduct a de novo review of those portions of the Report and Recommendation to which an objection has been properly made. 28 U.S.C. § 636(b)(1). An objection to a Report and Recommendation, however, is not meant to simply be a vehicle to rehash arguments set forth in the petition. The Court is under no obligation to review de novo objections that are merely an attempt to have the district court reexamine the same arguments set forth in the petition and briefs. *Roberts v. Warden, Toledo Corr*. *Inst.*, 2010 WL 2794246, at *7 (S.D. Ohio July 14, 2010) (citation omitted); *see Sackall v. Heckler*, 104 F.R.D. 401, 402 (D.R.I. 1984) ("These rules serve a clear and sensible purpose: if the magistrate system is to be effective, and if profligate wasting of judicial resources is to be avoided, the district court should be spared the chore of traversing ground already plowed by the magistrate. . . .").

As Petitioner's objections to ground four are mere recitations of his previous arguments, the Court finds that Petitioner's objections are not well-taken. The Court agrees with the

19

(1:16-CV-2712)

magistrate judge's conclusion that Petitioner's assertions do not present an actionable federal habeas claim. Accordingly, ground four is dismissed as non-cognizable on habeas review.

### IV. Conclusion

For the foregoing reasons, Petitioner's Objections ([ECF No. 20](#)) are overruled and the Report and Recommendation ([ECF No. 15](#)) of the magistrate judge is adopted. Major D. Jamie's Petition for a Writ of Habeas Corpus ([ECF No. 1](#)) is dismissed. The Court certifies, pursuant to [28 U.S.C. § 1915(a)(3)](#), that an appeal from this decision could not be taken in good faith, and that there is no basis upon which to issue a certificate of appealability. [28 U.S.C. § 2253(c)](#); [Fed. R. App. P. 22(b)](#).

    IT IS SO ORDERED.

| | |
|---|---|
| March 25, 2020 | /s/ Benita Y. Pearson |
| Date | Benita Y. Pearson<br>United States District Judge |